686 So.2d 883 (1996)
H.T. OLINDE, Jr., Meredith H. Lieux, Eugene Roy, Raymond Long, James E. Kissner, Esper Marionneaux, Jr., Greg Roy, J.B. Olinde, Levy Dabadie, Jr., Harold E. Morris, Craig A. Major, for Themselves and on Behalf of All Other Shareholders of Great Guaranty Bancshares, Inc.
v.
The 400 GROUP, an Unincorporated Association, and Great Guaranty Bancshares, Inc.
No. 95 CA 1233.
Court of Appeal of Louisiana, First Circuit.
December 6, 1996.
Rehearing Denied February 7, 1997.
Bob D. Tucker, Wendell H. Holmes, Baton Rouge, LA, for Appellants, Great Guaranty *884 Bancshares and Guaranty Bank and Trust, as successor to H.T. Olinde, et al.
Michael T. Perry, Baton Rouge, LA, for Appellee, The 400 Group.
Before SHORTESS, LeBLANC, PARRO and KUHN, JJ., and THOMAS W. TANNER, Judge Pro Tem.[1]
SHORTESS, Judge.
This is a declaratory judgment action initially filed as a derivative action by certain shareholders of Great Guaranty Bancshares, Inc. (Bancshares), a one-bank holding company. Bancshares' one asset is 100% of the stock of Guaranty Bank & Trust Company (Guaranty), in New Roads, Louisiana.[2] In 1982, Bancshares borrowed $1.5 million from Capital Bank & Trust (Capital Bank) and injected it into Guaranty. In December 1987, sixteen individuals formed an unincorporated association named "The 400 Group." The 400 Group was composed of all ten members of the Guaranty Board of Directors (the Board),[3] several non-director shareholders of Bancshares, and several outsiders. Its initial purpose was to purchase Bancshares' outstanding $1.5 million promissory note from Capital Bank, N.A., successor to Capital Bank, for $400,000.00. The note was secured by 100% of Guaranty's stock. The 400 Group agreed to "put up" the money necessary to buy the discounted note, and agreed to cancel this debt in exchange for Guaranty stock at a future date as determined by the Board. In a written agreement, The 400 Group also acknowledged Guaranty's need for additional capital and agreed to contribute to the recapitalization, if necessary.
The 400 Group subsequently loaned Bancshares approximately $600,000.00, evidenced by two promissory notes in the amounts of $414,223.28 and $186,000.00. These notes also were secured by the pledge of 100% of Guaranty's stock. The 400 Group eventually agreed to cancel the entire debt in exchange for 90% of Guaranty's stock. The Board approved the above transactions. In late 1992, the Board wanted to go forward with the stock exchange, but Guaranty's accountants advised the exchange needed to be with Bancshares stock rather than Guaranty stock. Attorneys advised the Board this change needed to be ratified by the shareholders. In December 1992, with some opposition, the Board obtained shareholder approval. However, some shareholders sought to postpone voting on this issue, and they called a special shareholder meeting in February 1993. At this meeting, the December ratification was rescinded. The shareholders further resolved to remove any directors who were members of The 400 Group should they join in any future legal action against Bancshares. In April 1993, The 400 Group made demand on Bancshares for the full face value of the three notes, plus interest and attorney fees.[4] Certain Bancshares shareholders filed this shareholders-derivative suit on May 7, 1993, challenging the validity of the proposed Guaranty stock pledge and seeking to establish the amount, if any, owed to The 400 Group on the three notes. The 400 Group filed a reconventional demand seeking the face values of all three notes, plus interest and attorney fees, or, alternatively, for a 90% ownership interest in Bancshares in exchange for cancellation of the entire debt. At a special shareholder meeting held August 10, 1993, the ten Board members who were members of The 400 Group were removed. Thomas R. Bryan (Bryan), a Bancshares director, Chief Executive Officer of Guaranty, and the appointed agent for The 400 Group, was relieved of his duties.[5]
*885 After a nine-day trial, the trial court found The 400 Group was entitled to recover the full face amount of all three notes, plus interest as stated in the notes, and awarded $155,000.00 in attorney fees. The judgment also recognized the pledge of 100% of Guaranty's stock securing all of the notes. Bancshares appealed.

A. THE LAW OF FIDUCIARY DUTY AND INTERESTED DIRECTOR TRANSACTIONS
State bank officers and directors owe a fiduciary duty to their bank and its stockholders. La.R.S. 6:291;[6]Babineaux v. Judiciary Comm'n, 341 So.2d 396, 400 (La.1976). The fiduciary must handle matters as though they were his own affairs and may not take even the slightest advantage, "but must zealously ... guard and champion the rights of his principal against all other persons whomsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent." Noe v. Roussel, 310 So.2d 806, 819 (La.1975).
The fiduciary cannot take advantage of his position for his personal benefit to the detriment of the corporation or its shareholders. Spruiell v. Ludwig, 568 So.2d 133, 141 (La.App. 5th Cir.1990), writ denied, 573 So.2d 1117 (La.1991). However, transactions between the directors and the corporation are not voidable simply because of the relationship of the parties. Louisiana Revised Statute 12:84, which sets guidelines for such transactions, provides:
A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
(1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
(2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or
(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.
B. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorized the contract or transaction.
Thus, the statute does not automatically void an interested director transaction if: 1) it is authorized by vote only of the disinterested directors, or 2) it is approved in good faith by vote of the shareholders who have knowledge of the material facts as to the directors' interest and the transaction, or 3) the transaction was fair to the corporation as of the time it was authorized, approved, or ratified by the board of directors or shareholders.
*886 Furthermore, for almost a century, the supreme court has followed the rule that a fiduciary's dealings with the corporation are subjected to rigorous scrutiny and where any of his contracts or engagements with the corporation is challenged, the burden is on the fiduciary not only to prove the good faith of the transactions involved, but also to show their inherent fairness from the viewpoint of the corporation and its shareholders. Levy v. Billeaud, 443 So.2d 539, 543 (La.1983); Crescent City Brewing Co. v. Flanner, 44 La.Ann. 22, 25-26, 10 So. 384, 385 (La.1891); Hancock v. Holbrook, 40 La.Ann. 53, 3 So. 351 (La.1888).
In Noe, 310 So.2d at 819, the supreme court applied this "test of rigorous scrutiny" as stated in Pepper v. Litton, 308 U.S. 295, 306-307, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939): "The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arms length bargain. If it does not, equity will set it aside." (Footnote omitted.)
With the foregoing legal precepts in mind, the record and evidence in this case were reviewed thoroughly. The trial court's oral reasons indicate it found the transactions involving purchase of the $1.5 million note were not voidable and The 400 Group was entitled to collect on the full face value of the note with its pledged security.[7] It also validated the execution of the two subsequent notes and the pledge of Guaranty stock as security on these notes. The court refused to enforce the 90/10 stock exchange because of "some misgiving about the extent to which the communication to the shareholders in the proxy material might really have advised them in respect to the overall dealings."

B. THE HISTORY OF GUARANTY
Guaranty was chartered in 1956 in New Roads, Louisiana, by local residents as a full-service commercial bank. Its principal market is Pointe Coupee Parish.

1. 1980 to 1985: Boom to Bust
The early 1980's were a time of prosperity in Louisiana. The oil business was booming, and agricultural productivity was good. The real estate and construction markets responded to this prosperity with inflated prices and increased construction. Banks and savings and loans across the state were collecting more and more money from depositors (bank liabilities), and these institutions needed to balance this increasing liability by increasing loans and capital (bank assets). As a result, banks approved riskier loans, financed many real estate and other speculative ventures, and generally engaged in relaxed banking practices. Banks also sought ways to increase equity money to maintain proper capital-to-asset ratios, as required by federal and state regulations.
Pointe Coupee Parish experienced this growth and prosperity. Responding to Guaranty's need for more capital, Bancshares was organized in 1981 under the laws of Louisiana for the purpose of becoming a one-bank holding company. In 1982, Bancshares acquired all the outstanding shares of Guaranty. Bancshares' only asset was Guaranty's stock. At this time, Bancshares borrowed from Capital Bank $1.5 million, which was injected into Guaranty to increase its equity capital. The debt was secured by a pledge of 80% of Guaranty's stock. Periodic interest and principal on the note were paid with dividends issued by Guaranty to Bancshares, with final payment due November 1, 1994. By 1985, however, the economic tide had turned. The oil business experienced a tremendous decline, and real estate prices plummeted. Businesses began going bankrupt; newly-constructed buildings sat unfinished or unoccupied; people and businesses went into default on their loans.

2. 1985 to 1987: Hanging on
A cease-and-desist order issued by the Federal Deposit Insurance Corporation (FDIC), in which the Louisiana Office of Financial Institutions (OFI) joined, was issued against Guaranty in November 1985.
*887 The order required many things, one of which was hiring management acceptable to the FDIC and OFI. The Board had recently hired Bryan as Chief Executive Officer, and he met this requirement. The order also required Guaranty to increase its equity capital and reserves by $4 million within 180 days of the order. The FDIC and OFI generally consider a capital-to-assets ratio of 7% to 8% adequate; at this point, however, Guaranty's ratio was approximately 1%. Efforts to raise additional money for Guaranty had already begun, but the need to do so now became critical. A class of preferred stock was authorized in January 1986, but attempts to sell it were unsuccessful.
Another portion of the cease-and-desist order prohibited paying dividends without FDIC and OFI approval. Even before that order, Capital Bank had become concerned about its loan, and on October 7, 1985, Bancshares pledged the remaining 20% of Guaranty's stock as additional security for the note. As a result of Guaranty's inability to pay dividends, Bancshares was unable to pay principal and interest payments as they became due. On two occasions, Board members paid interest on the note by loaning personal funds to Bancshares. In November 1985, however, a principal payment was not made, and Bancshares went into default.
On March 19, 1986, Capital Bank filed suit against Bancshares for failure to pay, seeking the principal plus interest from November 1985 and attorney fees, for a total of $1,407,838.35, plus continuing interest.[8] Capital Bank also sought to enforce the pledges of Guaranty stock. If Capital Bank took possession of the stock or otherwise disposed of it, Bancshares, and therefore its shareholders, would lose Guaranty. Consequently, Bancshares' stock would be worthless.
That same month, however, Bryan learned of a new FDIC plan called the "Capital Forbearance Program." Banks which met certain criteria could be accepted in this program, under which the FDIC would not take administrative action to enforce normal equity capital standards. However, Guaranty's asset portfolio did not meet the criteria for the program at that time. Furthermore, Bancshares' stock was worthless due to Guaranty's weak financial condition.[9] Bryan's notes and the minutes from a June 4, 1986, Board meeting show the Board still had no solution to the capital problem and had identified no investors.
In a letter and notice of the December 1986 shareholder meeting, Bryan outlined plans to apply for a revised forbearance program.[10] If accepted by the FDIC, the plan would reduce the capital required to keep Guaranty open to 4% and extend the deadline to meet the 8% capital-to-assets ratio to 1992. Bryan further discussed several possible options for raising the estimated $1.5 million in capital, which would have brought Guaranty to the 4% needed to get into the program. First, each shareholder could buy a pro rata share of the $1.5 million based on current ownership. By this means, voting control would remain with the current shareholders. Second, stock could be sold to any smaller group of interested local people, which may or may not include current shareholders. This group would then gain voting control of the corporation. Or third, stock could be sold to outsiders or ownership transferred to another bank or institution. Bryan advised that shareholders were more likely to lose either control or their entire investment with the second and third alternatives. Bryan's notes following this meeting indicate the shareholders were more worried about their investment than in maintaining control.

3. 1987: Glimmers of Hope
In January 1987, Bryan wrote to FDIC Regional Director Bill Houston to report on *888 Guaranty's progress and to present his plan for raising capital. Part of the plan depended on Capital Bank either converting the loan into an equity position in Bancshares, or allowing Guaranty to buy the note for the present book value, "which we are told is in the neighborhood of $400,000.00." Either of these alternatives would relieve Guaranty of the debt burden of the note.
In May 1987, Bryan wrote to the shareholders explaining Capital Bank had rejected Guaranty's attempt to buy the note at a discount. The letter also gave notice of a special shareholder meeting scheduled June 10, 1987, to consider a plan to exchange Guaranty's stock in return for cancellation of the note. Under this plan, Capital Bank would keep 24.9% of the stock and offer 75.1% back for purchase by the shareholders of Bancshares for $1 million.[11] Capital Bank would then inject the necessary $1 million into Guaranty, which would meet the forbearance program requirements. If the shares were not purchased locally, then they would be offered to any interested person. Bryan wrote the Board that he believed "this to be the most viable proposal we have received," and "several of the undersigned [directors] have already indicated a desire to purchase stock in the Bank in an effort to recapitalize it."
At the shareholder meeting, Bryan explained the letter using an overhead projector and transparencies, and he explained the forbearance program. The minutes of the meeting reflect discussion then centered around the Capital Bank proposal. Bryan's notes from Guaranty officers' meeting the next day indicated only 15 of approximately 480 shareholders attended the meeting.
In September 1987, Bryan wrote to the shareholders to report the FDIC had approved Guaranty for the forbearance program and Capital Bank had agreed to cancel the debt, take 100% of Guaranty stock, keep 24.9%, and offer 75.1% to the shareholders for repurchase. Efforts were now concentrated on raising $1 million from the shareholders to repurchase the 75.1%. By early October, however, Bryan learned Capital Bank was also in financial trouble and the deal would not be consummated. Capital Bank, however, was willing to reconsider an offer to buy the note.
At this point, Bryan began exploring ways to purchase the note. For example, he explored ways to use Guaranty's capital to purchase the note or for Guaranty to pay a dividend to Bancshares so Bancshares could buy the note. The FDIC refused to approve these approaches because either would reduce the already low equity capital to a perilously low amount. However, in telephone conversations, the FDIC indicated it was willing to accept an injection of $1 million and to let the $400,000.00 count toward this amount if it were used to purchase the Capital Bank note at a discount.
On October 22, 1987, Bryan reapplied for the forbearance program.[12] He proposed to make a written offer to Capital Bank of $400,000.00 that day and to make an injection of $600,000.00 by February 1988. Bryan wrote to Capital Bank, as he indicated to the FDIC he would, on October 22 offering to purchase Bancshares' note for $400,000.00. This offer was made on Guaranty letterhead in Bryan's capacity as CEO and was made on behalf of Guaranty. Because he knew Guaranty could not buy the note itself, Bryan also stated, "Guaranty Bank reserves the right to assign its rights hereunder." The offer was to remain open until 5:00 p.m. on October 26, 1987. But on October 30, Capital Bank was declared insolvent, and a "bridge bank," Capital Bank, N.A., was created by the FDIC.
Bryan wrote to the shareholders on November 4, 1987, calling a shareholder meeting for November 18, 1987, regarding recapitalization of Guaranty. The letter informed shareholders the prior plan to exchange debt for equity with Capital Bank "may be changed" due to Capital Bank's closure. It stated the Board felt this was "a good time to attempt to buy Capital Bank's note" and *889 "substantial cash will be required." It further stated:
We are calling a special shareholders' meeting to discuss these events and to see if any shareholders are interested in grouping together and making an immediate financial commitment to purchase Bancshares' note. We believe that the Bank [Guaranty] will have a better chance for long term success if the note is held by current shareholders of Bancshares or by other local individuals.
If a group purchases the note, the actions of the group would not be the corporate act of either the Bank or Bancshares. Since The 400 Group would have the stock of Guaranty Bank in pledge as security for the note, that group could then control the destiny of Guaranty Bank, just as Capital Bank N.A. now does.
Because of the influence the holders of the note may exert over the destiny of Guaranty Bank and because the holders of the note might even wind up controlling Guaranty Bank, we want to inform all shareholders of the opportunity that might arise to buy the note and to offer to all shareholders the opportunity to become a part of the group that may acquire the note.
Please be aware that even if a group is able to purchase the note, a substantial additional cash injection would then be necessary to increase the capital of Guaranty Bank to a level satisfactory to the F.D.I.C. This requirement for additional capital makes the purchase of the note a risky undertaking since the task of raising additional capital might eventually fall squarely on the shoulders of the note holders.
The letter then stated in bold letters: "WE URGE YOU TO ATTEND THE NOVEMBER 18, 1987 SPECIAL MEETING. THE CONTROL AND DESTINY OF GUARANTY BANK IS AT STAKE."
At the November 11, 1987, Board meeting, Bryan noted there had been no response to this letter. The minutes from the Executive Committee meeting reflect Bryan spoke to Bill Houston of the FDIC on November 6, 1987, and Houston "stood ready to cooperate with us and put us in the forbearance program." Houston also told Bryan Guaranty must deal with the bridge bank, Capital Bank, N.A. in its attempt to purchase the note, and that the FDIC had placed the board of the bridge bank in charge and would not interfere.
At Guaranty's Executive Committee meeting held the same day as the shareholder meeting, November 18, Bryan reported to Guaranty's Board that Guaranty was informally in the forbearance program. Bryan also reported Capital Bank, N.A., wanted $600,000.00 for the note. The Board did not feel the note should be purchased for more than $400,000.00, and "[i]t was decided that a posture of wait and see would be appropriate for at least a few weeks" in hopes that Capital Bank, N.A., would come down on the counter offer. Bryan's notes from a Guaranty officers' meeting held the day after the shareholder meeting reflect only a few shareholders attended and no one offered to extend any money.[13] Bryan testified the revised forbearance plan and the proposed purchase of the note for $400,000.00 were explained to the few who were at the meeting.

4. The 400 Group Forms
By approximately December 2, 1987, Bryan learned Capital Bank, N.A., would sell the note for $400,000.00. A meeting to discuss purchasing the note was held December 7, 1987. Handwritten notes from this meeting, taken by James Dewey, attorney for Bancshares and Guaranty, and minutes, which he subsequently prepared, reflect the discussion. Fifteen individuals attended, including two "key outsiders," the Board, and several shareholders.[14]
*890 According to Dewey, the meeting "bogged down" over the issue of a reasonable rate of return to those who were willing to take the risk inherent in putting up the necessary funds to purchase the note. Dewey's notes indicate that for some at the meeting, "ownership is key" and Bryan was "not interested in investment of [money] to earn interest."[15] He stated, "Mr. Bryan felt like if you're [going to] put the money up you're not talking about interest. The ... risk factors were just too high."
At trial, Dewey explained that
in the meeting there were some people who felt like if they were [going to] put the money up, and actually I feel like it was more of the people who I would have considered outsiders, ... they weren't interested in interest. They wanted to be given a controlling share or a big block of the stock or something....
Dewey stated the people attending the meeting could not come up with an interest rate that would equal the risk they were taking. Dewey stated, "I think some of the people in the meeting had never really considered interest, and they were not in there for a situation of making a loan like you would make a loan on a house or something."
Discussion at one point specifically centered on whether the present shareholders would be dissatisfied with retaining only 10% control. Bryan stated anything the shareholders received would be a "gift" because "the holding company stock is worth nothing today." Dewey testified that Marion Monk, a director who died before trial, and some others had disagreed. By the time the meeting was over, those present had informally pledged $545,000.00, but nothing specific was decided regarding the percentage of stock to be exchanged.[16]
The minutes reflect The 400 Group, which at this point had no name, agreed as follows, in part:
1. That the primary goal of The 400 Group would be to obtain the note and then to use the rights of the holder of said note to insure that the management of Guaranty is directed to raise the additional capital required by the F.D.I.C.....
* * * * * *
4. That after obtaining the note it would be eventually exchanged for stock in Guaranty....
5. That if any extended period of time elapses between when the note is purchased and the exchange of it for stock, that The 400 Group should receive a reasonable interest rate on the funds they advance for purchase of the note.
6. That it would be advantageous to the bank to leave at least 10% of the ownership of the bank with the current owners of the holding company in order to help preserve current and future business with those persons with the bank.
* * * * * *
11. That [Bryan] shall act as agent for The 400 Group to negotiate and transact all agreements and to execute all documents necessary....
In a letter dated December 17, 1987, the FDIC confirmed it had accepted Guaranty's proposal for the forbearance program. On December 23, 1987, sixteen individuals contributed funds to the purchase and recapitalization project and signed a document drawn by Dewey, titled "Agreement for Purchase of Note and Statement of Intent and Authority."[17] An attachment to the agreement *891 shows initial contributions totaled approximately $600,000.00.[18] This agreement contained "two primary objectives." The first was to purchase the note for $400,000.00, and to hold the note,
together with all rights due to any holder thereof, including the right to make demand on the debtor therein, and to execute on any judgment or foreclose on any collateral securing said note and/or the obligation it represents.
The second primary objective was
that the bank will be required by the group to raise $600,000 of additional capital [money] during 1988, anticipated to be through the sale of stock but which the group may allow to be raised in whole or part through other means. The money invested and remaining after purchase of the note will be used to purchase bank stock in the contemplated stock sale ... with the intent that the group acquire more than 51% of the outstanding voting stock of the bank in exchange for the forgivness [sic] of the note....
The agreement designated the name of the group as "The 400 Group" and named Bryan its president and "sole agent and attorney in fact." The agreement also expressly provided the note would be "eventually exchanged for stock in the bank, with the details of how this would be accomplished to be resolved later," and for a "reasonable interest rate" on funds advanced to purchase the note "if any extended period of time elapses between when the note is purchased and the exchange of it for stock." Finally, The 400 Group agreed to dissolve after the exchange of stock was accomplished. On December 31, 1987, the note was purchased by Bryan on behalf of The 400 Group for $400,000.00.

5. January 1988 to June 1988: Raising the Additional Capital
Bryan later wrote a letter to The 400 Group members in January 1988. His letter confirmed that the Capital Bank note had been purchased, and he enclosed a copy of the executed agreement for each member. He wrote to them again in March, explaining how the additional $200,000.00 of their money was being handled by Guaranty, and he called a meeting for March 23 "to discuss the raising of the additional $400,000 required by the Forbearance Program."
A special Board meeting was held March 28, 1988, at the Commissioner of OFI's office, also attended by representatives from the FDIC, to discuss Guaranty's current financial status. FDIC officials noted Guaranty was not in compliance with the forbearance plan and the modified cease-and-desist order because: (1) the capital injection had not been made in February as agreed, (2) Guaranty had inadequate "loan loss" reserves, and (3) it had failed to file quarterly progress reports. Fred Dent, then Commissioner of OFI, testified that Guaranty essentially was insolvent at this time and he could have closed it. However, Dent, the OFI, and the FDIC maintained an ongoing effort not to close locally owned and operated banks if management was committed and some progress was being made. Therefore, extra efforts were made to give Guaranty time to correct its deficiencies.
Bryan told officials at this March 28 meeting The 400 Group had purchased the note and was committed to extending another $400,000.00, which would leave only $200,000.00 needed to meet the $600,000.00 requirement. When asked by FDIC regional director Houston how this $200,000.00 would be raised, Bryan said it would have to be raised by a person other than a member of The 400 Group. He said that would be difficult because of a suit filed by a former director against Guaranty.[19] After discussing *892 various other matters concerning Guaranty's financial status, the meeting was adjourned. No money was injected at this time.
On April 20, 1988, FDIC official Nick Stacy informed Bryan the FDIC would begin withdrawing deposit insurance if $600,000.00 were not injected within 48 hours. Louisiana law required Guaranty to maintain deposit insurance, so withdrawal of insurance would have forced OFI to close it. The Board minutes of April 22, 1988, reflect Bryan "reminded" the Board of his conversation with Stacy and recommended a capital injection as soon as possible. Bryan indicated The 400 Group had raised approximately $430,000.00 in anticipation of keeping Guaranty open, and the remaining $200,000.00 needed to come from the shareholders or The 400 Group. The Guaranty minutes state:
We anticipate, and in fact have been asked by The 400 Group to exchange 90% of the stock for, a) The $1,500,000 note, b) The new $430,000 note to be approved and executed today, and the additional $170,000 to be raised. The total consideration being $1,000,000. The 400 Group has indicated it does not desire to have either the $1,500,000 or the $430,000 note paid in cash. Rather it prefers the exchange of stock in lieu of a cash payment and this exchange be made when it is most beneficial to the Bank [Guaranty] ... Cash will be the method of payment only if the exchange of stock does not take place. Therefore it is important to obtain the concurrence of the stockholders relative to the exchange, so that we may satisfy Bancshares obligation on the $430,000 and $1,500,000 notes.
We have asked Sheshunoff and Company for a fairness opinion on this transaction.
The shareholders will be asked to approve the exchange of the $1,000,000 for 90% of Guaranty's stock at the Shareholder Meeting in May 1988.
The Board thereafter executed a note payable to The 400 Group for $414,223.28, pledged all Guaranty's stock to secure the note, and injected this money into Guaranty.[20]
Bryan again wrote The 400 Group on April 26, 1988, to apprise its members of Bank matters and attached a new breakdown of contribution percentages.[21]

6. The Shareholders
Following the November 4, 1987, letter and the November 18, 1987, shareholder meeting, the shareholders did not receive any communications from Bryan or the Board until June 1988. A special shareholder meeting was held June 13, 1988.
A letter accompanying proxy materials issued prior to the June 1988 meeting explained that The 400 Group purchased the note for $400,000.00, secured by Guaranty stock, that The 400 Group subsequently raised and loaned an additional $414,223.00, and that Guaranty still needed $186,000.00. The letter further stated:
The 400 Group proposes to take on the responsibility of raising the additional $186,000. In exchange for the cancellation of all of Bancshares' indebtedness to The 400 Group, its members would receive 90% of the stock of Guaranty Bank.
The letter said the Board supported the proposal because (1) Bancshares' stock (at that time) had a negative value and cancellation of the debt would cause it to have a positive value; (2) the proposal would also eliminate pressure to repay the debt and will aid in rebuilding capital; (3) "WE BELIEVE *893 THAT 10% OF SOMETHING POSITIVE IS BETTER THAN 100% OF SOMETHING NEGATIVE"; and (4) "it is fair to everyone ... [and a] nationally recognized Bank consulting firm has given us an opinion that this exchange is fair and equitable to all Bancshares' stockholders from a financial point of view."[22] The Board also supported the proposal because shareholders could participate by joining The 400 Group. "Those joining now will be treated in all respects as though they were part of the original Group, and everyone will share pro rata in the exchange of stock."
The letter stated that if the proposal is not approved, "it is likely that Bancshares will lose all of its ownership interest in Guaranty Bank and our stock will have no value." This letter is signed "Your Board of Directors."
The proxy materials went into greater depth regarding the stock exchange proposal. The vote required to ratify the Board's action was a majority of the votes cast at the meeting, "without counting the votes of the persons who hold the notes.... Those persons own 18,650 shares (13%) of the common stock of Bancshares." On page 14, under the "Stockholder Approval" segment, the materials state:
If the Board authorization of the transaction is not ratified, the 400 Group will consider alternatives available to it, including seizing and selling Guaranty stock pledged to it.
All of the members of the Board of Directors recommend that the stockholders vote for the proposal to ratify the Board's action authorizing the exchange... at a time within the discretion of the Board.
On page 16, the materials state:
It is anticipated that after the proposed exchange, Bancshares will have no assets except for 10% of the shares of stock of the Bank. If the proposed transactions result in any tax liabilities, Bancshares may have to liquidate its remaining holdings of Bank stock in order to pay such liabilities. In that event, the stockholders of Bancshares would have no further interest in the Bank.
Also on page 16, under "Conflicts of Interest," the materials state:
The proposal to ratify the Board's action, authorizing the exchange of Bank stock for Bancshares indebtedness presents the Board of Directors with actual or potential conflicts of interest since each member of the Board is also a member of the 400 Group.
The materials then explained The 400 Group included the ten directors on the Board. Information about the six other members, the shares each of the sixteen members owned in Bancshares, and the percentage interest they would own after the exchange was also provided.
On page 18, under "Conditions of the Exchange," the materials stated that although The 400 Group intended to go forward with the exchange once ratified, "the 400 Group can decide at any time not to go forward with the exchange.... In addition, the Board of Directors can decide, in its discretion, when to undertake the exchange."
The discussion regarding the proposal was recorded by a court reporter. Charles Browning, who attended the meeting, asked what possibilities had been explored other than transfer of 90% of Guaranty's stock. Bryan did not specifically answer this question. Browning stated that if Guaranty stock was worthless, at least the shareholders would have a loss on their tax returns. With the exchange, however, shareholders would not recognize a loss even though their stock was reduced to 10% of its original worth. Bryan responded that this issue was "not something we had ever seriously thought *894 about. We had blinders on, I suppose, in our desire to salvage something for the shareholders." Bryan stated, "It's not that we want to force ten percent down someone's throat." He indicated a willingness to explore other methods. Bryan stated, "That's another reason ... we don't have to do that transaction right now. What we were trying to do is get shareholder approval of the general gist of doing this...."
No alternative solutions were suggested, and the proposal was ratified. Bryan advised the shareholders by letter dated July 27, 1988, the proposal had been ratified and, with six new contributors, Guaranty needed only an additional $65,000.00. Bryan again extended an invitation "to any shareholder who is interested in helping raise this final amount." The letter further stated, "Those contributing now will be treated in all respects as though they were members of the original [400] Group." The 400 Group subsequently raised and injected the remaining funds, and Bancshares executed a second promissory note for $186,000.00, also secured by a pledge of 100% of Guaranty's stock.[23]

7. July 1988 to 1993: Getting Back to Business as Usual
After the injection of the final $186,000.00 from The 400 Group, Guaranty essentially met the most significant requirement of the modified cease-and-desist order. Guaranty's efforts now centered on returning to a profitable status and continuing to meet projections of gradually increasing equity capital. An October 1988 letter from Bryan again urged shareholders to participate in raising additional money and promised that all who did so would be included in The 400 Group "on the exact same terms as the original group." Bank records and testimony at trial showed Guaranty met and ultimately exceeded its goals as required by the forbearance program in this regard.[24]
On July 24, 1991, Larry Roberts, secretary and treasurer of Bancshares, wrote to Zane R. Kelly, a vice president of the Federal Reserve Bank of Atlanta, in response to an inspection of Bancshares.[25] Roberts stated he and Bryan felt "some relevant comments need to be made" to clarify statements in the report. He continued:
First and foremost, we must clear up a very important point. The Board of Directors have not yet determined that an exchange will positively take place. It should be stressed that the shareholders' resolution authorizing the exchange was not mandatory.
... the opportunity still exists that payment on the notes may be resumed when the bank is capable. At this time, many options still remain open, and the Board of Directors will consider all feasible alternatives to the exchange in determining if and when the exchange will take place.
. . . . .
In our annual discussions with Federal Reserve Examiners, we may have inadvertently given the false impression that the exchange was mandatory and would not take place until the [tax loss] carryforward was completely used up. As a result, we never discussed other options. Evidently the examiners assumed there were no other options and we neglected to voluntarily suggest what other options we might consider. The fact the purchase of the note by the 400 group and the subsequent *895 shareholder resolution eliminated all pressure on the parent company to service the debt was a welcome relief to both management and the Federal Reserve. As a result, it's limited our dialogue and confined our concentration to the resolution, and how it will [a]ffect the carryforward. However, there are other things that will be considered.
At a September 11, 1991, Board meeting, Bryan again discussed the exchange. The minutes reflect:
Bryan remarked that the resolution passed by the shareholders authorizing the exchange is not mandatory and it has not yet been determined if an exchange will actually take place. There seems to be some confusion among the Regulators with this fact, because alternatives to the exchange have never been discussed with them. The timing of the exchange was left to the discretion of the board and the board was charged with the responsibility of trying to select the most appropriate time that was mutually beneficial for the shareholders, the bank and the 400 Group. However, if the bank continues to earn a profit, it might be more beneficial to resume servicing the debt instead of cancelling it.
There seems to be a number of questions that need to be answered to comply with the shareholder resolution.
1. Should an exchange take place?
2. What is the most appropriate time?
Even though these statements and other documents indicated the exchange was not mandatory and other options were still under consideration, Bryan testified he always considered the exchange mandatory from the standpoint of the shareholders.

8. The Changing of the Guard
The record does not show whether the shareholders and the Board discussed the exchange again in any detail until November 1992. The exchange had been delayed by the Board to allow Guaranty to get tax advantages from its net operating losses. Its accountants projected the loss carryforward would be used up by 1993 and recommended the exchange be consummated. However, on the advice of its accountants, the Board sought a change: it now proposed to exchange 90% ownership of stock in Bancshares rather than stock in Guaranty. Bryan wrote to the shareholders November 20, 1992, telling them the book value of Bancshares' stock was negative ($7.77), but would have a positive book value of $1.44 after the exchange. The letter reminded them that the shareholders' ownership would be reduced to 10%. It stated the debt "plus accrued interest now stands at a little more than $3 million." It also encouraged shareholders to approve the proposal because the Board "has worked without pay for almost eight years" to insure Guaranty stayed open and to save something for the shareholders; the Federal Reserve was pressuring the Board to eliminate Bancshares' debt; "10% of something positive is better than 100% of something negative"; and "[i]f we don't approve proposal (2), it is likely that Bancshares will lose all of its ownership interest in [Guaranty] and our stock will have no value at all." Proxy materials accompanied the letter which further explained the mechanics of the exchange. The shareholder meeting was scheduled for December 9, 1992.
The day before the meeting, a former director and Bancshares' major shareholder Humphrey T. Olinde, Jr., wrote to Bryan expressing concern about the proposal, stating:
... I think that it is essential that all of the current shareholders of the holding company be fully informed concerning the proposed preferred stock issuance and have ample time to study the proposal and have any questions they may have answered. I do not believe that ample time has been afforded the shareholders for this purpose.
I received my copy of the proxy solicitation materials shortly before Thanksgiving and, because of the holiday, have had only a few days to review it. I have a number of questions concerning the preferred stock issuance proposal, including the reason the 400 Group is valuing the promissory note they purchased from the FDIC at face amount rather than at the amount they actually paid for the note. I also do *896 not have information relating to the manner in which interest accrued on the indebtedness owed to the 400 Group was computed.
In order for me to be able to better understand the proposal, I would like additional time to review and study it and have my questions answered. Other shareholders have contacted me concerning the proposal and I feel they too would like more time to consider it. I would prefer to have my questions and concerns addressed in a non-public forum because I think that doing so would be in the best interest of the bank and the holding company. Accordingly, I request that the preferred stock issuance proposal be deferred until a later date....
I have inquired as to the adequacy of the notice to shareholders concerning the ... proposal and the shareholder vote required to approve it. I have been informed that the Business Combination Provisions and the Control Share Acquisition Provisions of the Louisiana Business Corporation Law may be applicable to this proposal.... If these provisions are, indeed, applicable to this proposal, then the proposal should not be presented to the shareholders at tomorrow's meeting. If these provisions are not applicable ... I would like a full and complete explanation why they are not applicable.
Bryan polled the Board by telephone the same day, and he summarized the results in a letter hand-delivered to Olinde. In this letter, Bryan stated:
The Board has resolved to deny your request ... for the following, non exclusive reasons:
1. The shareholders have been aware of this problem and the impending resolution thereof for many years, and through many correspondences;
2. Sufficient notice was provided;
3. Holidays are upon us and to delay for the few remaining days before Christmas is not worth the expense, time, and effort to renotify all the shareholders;
4. In fact, the closer we get to Christmas the more inconvenient it will become to hold the meeting;
Nevertheless, I will be available to discuss proposal #2 with you or your attorney either before or during the meeting.
The meeting was held as scheduled on December 9, 1992. The minutes show Bryan reviewed events of the preceding years. After his presentation, Bryan opened the floor for questions and comments. J.B. Olinde, brother of H.T. Olinde, Jr., asked several questions about issues H.T. Olinde, Jr., had expressed concern about in his letter.[26] For example, he asked, "When you bought the note from the FDIC for $400,000, did you consider that you bought less than 30% of the face value?" The minutes show Bryan responded:
Capital Bank had sued us on the note. The main reason for purchasing the note was to relieve the bank [Guaranty] of the immediate payment obligation. Before they failed, Capital Bank was ready to take all the stock of Guaranty Bank. The board was attempting to avoid loss of 100% of the bank stock. We did not know what to expect from the FDIC or maybe another commercial bank that might acquire the loan from the FDIC. The 400 group purchased the note for the amount it had been written down to on Capital Bank's books. The 400 group actually took a substantial risk of uncollectability. There were also no assurances to the 400 group that the bank would even get under capital forbearance and thereby earn its way back to the required capital ratio. Maybe that is why more shareholders did not elect to participate. The board again solicited shareholder help when it was necessary to raise the additional $600,000, but there are still only 27 people in the 400 group. The problem now exists that if you don't charge off all the debt and redeem the debt for face value, there will be unforgiven debt and *897 adverse tax consequences to the holding company. Also the tax loss carryforward and the timing of the transaction will have a significant effect on the holding company tax position.
J.B. Olinde then made a motion to postpone the vote for a short time or at least until Bancshares' year-end statements were prepared.[27] The motion failed. The proposal was thereafter ratified by a vote of 54.6% in favor, and 45.3% against.
Opposition to the exchange persisted, and shareholders continued to ask questions regarding the exchange. In a letter dated December 18, 1992, Bryan wrote to the shareholders concerning objections to The 400 Group obtaining 90% in return for cancellation of the debt. He advised them the Board had been contacted by an attorney representing the objecting shareholders, and Bryan explained:
Now that this shareholder opposition has taken on legal overtones, the individual members of The 400 Group have informed the Board that they might not want to go through with the exchange.
They [The 400 Group] have informed the Board that they intend to keep all of their options open, which includes foreclosure on the notes. As you know from previous correspondence, foreclosure on the notes could mean that the shareholders will get nothing instead of the 10% previously offered.
This is a devastating turn of events. As you know the Board has worked since 1985 with no pay to not only salvage the Bank [Guaranty] but also [to] salvage 10% for the shareholders.
* * * * * *
While we saved the Bank, it appears we might be on the verge of losing the shareholders['] 10%.
I don't know what will happen next, but I will keep you informed.
The shareholders opposing the exchange then called a special shareholder meeting, held February 5, 1993, to discuss and vote on two proposals: 1) to rescind the December 1992 shareholder approval of the exchange, and 2) to remove any director who was a member of The 400 Group and who joined in legal action against Bancshares to collect on the notes.
A court reporter recorded the comments at the meeting. Shareholder Greg Roy began by commenting:
We just don't feel that the deal that Bancshares management is offering to the 400 Group and doing for the 400 Group and giving us in return is the best deal for the bank [Guaranty] and us as stockholders.
You know, we feel that management has done a good job of pulling this bank [Guaranty] out of the hole over the last few years. Nobody has questioned what management has done or the board of directors, but we just don't feel that based on what we see the potential the bank being in the future and what possibly is here right now that this would be a fair deal and an equitable deal for all of the stockholders.
* * * * * *
We can't see a justification of this [$]3.2 million debt based on the amount of money that the 400 Group loaned the bank. It's just not a reasonableif you come up with the 3.2, it just doesn't work out to a reasonable return of interest, and so we just don't think it's equitable.
Another shareholder, Patricia Laurent, asked if her understanding of the transaction was correct, that
maybe I have $10,000 worth of stock, the bank has used my money for 35 years, and... now it is worth [$]1,000 if this new plan goes through.... But the new group who has bought stock for five years now, their money, if they bought $10,000 worth, it's going to be worth three and a half times as much?
Esper Marionneaux, a shareholder, confirmed this was correct. Shareholder Craig Major commented he did not own a large amount of stock, but could not see the fairness to the small stockholder. "I look at the people ... who have a hundred shares and *898 fifty shares and five shares who put up their money back in 1957 to start a bank that would be fair. But it's not winding up like that," Major stated.
J.B. Olinde said the purpose of the meeting was to get more information about the fairness of the exchange and a valuation of the stock. Olinde stated, "That's all the meeting is about, nothing else. And we would like the opportunity to sit down with these people to discuss this, to give our side of the view and let them arrive at something that is fair."
Larry Roberts, speaking on behalf of Guaranty's management, reviewed prior efforts to raise money and the lack of shareholder participation or interest. He also stated Guaranty's accountants recommended delaying the exchange until most of its tax loss carryover was used up.[28] Roberts said the accountants advised in 1992 the tax loss was almost depleted, but indicated a tax problem would arise with cancellation of the debt in exchange for Guaranty stock. To avoid severe tax consequences, the exchange needed to be with Bancshares' stock.
Bryan emphasized the exchange was not really different from the proposed exchange in 1988, which was approved, and stated, "if 90 percent was fair in 1988, 90 percent is fair today." He explained that at a current book value of $2.2 million, 90% of Bancshares stock had a value of $1.97 million, representing an annual rate of return of 14.57% of the $1 million invested by The 400 Group. Bryan further emphasized the magnitude of the risk in 1987 and taken by The 400 Group in extending the money.
Ultimately, the shareholders voted 55.6% in favor and 44.4% against the proposals, thereby rescinding approval of the 50/10 stock exchange. Because no legal action had been taken by The 400 Group at this time, the makeup of the Board and the management of Guaranty did not change.
On March 29, 1993, however, Bancshares received formal demand letters on all three notes from legal counsel representing The 400 Group. In its April 1, 1993, meeting, the Board acknowledged receipt of these and again acknowledged Bancshares' lack of cash or other means of paying the debt. Then, on April 29, 1993, Bancshares received a "Notice of Proposed Sale by Secured Party of Common Stock of Team Bank & Trust Co. (Formerly Guaranty Bank and Trust Co.) of New Roads, Louisiana." This public sale of Guaranty's stock was to be conducted June 1, 1993, but it was later canceled.
At a special shareholder meeting held August 10, 1993, ten Board members, who were also members of The 400 Group, were removed.[29] Larry J. Roberts and Stephen P. Bergeron, who were former directors but not members of The 400 Group, were retained on the Board. New Board members were elected, including Joseph L. Dabadie, Jr., Craig A. Major, H.T. Olinde, Jr., J. Layne Orillion, F. Eugene Roy, and F. Gregory Roy. At the new Board's first meeting, it relieved Bryan of his duties and replaced him with Roberts. New legal counsel was appointed for Guaranty and Bancshares, and Guaranty was directed to pay all outstanding legal fees. Finally, the Board resolved to defend Bancshares against the claims of The 400 Group.
From 1988 to 1992, Guaranty's operating income profits increased. Although The 400 Group had 27 members, records show the total investment of former Bank directors was 69.26%. By December 1993, the FDIC cease and desist order was terminated and Guaranty had enough capital and operating *899 income to issue a dividend of up to $137,500.00.

C. WERE DUTIES BREACHED?
First, The 400 Group has maintained that recapitalizing Guaranty financially saved it, and thus, was fair to Guaranty when the transactions occurred. Second, The 400 Group contends Bancshares stock was essentially worthless, and a deal that gave stock value to shareholders was "something" which was better than nothing. Finally, The 400 Group argues the risk taken by it in extending more money to save the failing Bank justifies giving 90% ownership to The 400 Group.
The shareholders do not dispute the Capital Bank note purchase and the money were necessary to save Guaranty. However, they challenge the method chosen to do so and the fairness to the shareholders of a 90% exchange of ownership for cancellation of the debt. They also challenge The 400 Group's right to collect the full face value of the $1.5 million note that was purchased at a discount for $400,000.00.
Our review of the record convinces us the Board breached its fiduciary duties to the shareholders. Although the injection of money admittedly saved Guaranty from the OFI and the FDIC, the documentary evidence and trial testimony showed the Board did not communicate essential facts to the shareholders between the end of November 1987 and the shareholder meeting in July 1988. Furthermore, the information contained in the proxy materials regarding the debts on the notes was complex and it included tax and legal opinions which may have been confusing to the shareholders.
Although the trial court understood the Board was limited by time constraints at critical times, the record shows nothing prevented the Board from communicating with the shareholders by letter to inform them and explain the unfolding events. Bryan stated the legal requirements regarding the information to be disclosed and how to completely and accurately disclose this information required him to get legal assistance, which took time. He said events were changing so fast that he did not have enough time to communicate with the shareholders. Nevertheless, documents in evidence show that before the November 1987 shareholder meeting, shareholders were sometimes informed of critical events by letter. Bryan was not required to issue full proxy materials to keep the shareholders informed of events which were unfolding and changing so fast.
We believe the Board lost sight of its fiduciary duties, though it does not seem to have done so intentionally. Bryan testified he did not send a letter to the shareholders telling them about The 400 Group in December 1987 because:
[W]hen they put up their money after that and became a group of people operating independently of the company, they didn'tthey did not have an obligation to, I'm assuming, to inform the Shareholders and the company's obligation was to inform the Shareholders at that point in time where we had been able to, I guess, get our breath and tell the shareholders accurately, what we faced and how this thing was all going to come down.
Throughout Bryan's testimony, he apparently viewed The 400 Group as an independent entity with no obligations to the shareholders. However, none of the directors, including Bryan, who had been designated president and agent of The 400 Group, ever resigned their positions with Guaranty or Bancshares. They, therefore, continued to owe a fiduciary duty to Guaranty. This duty remained despite their belief that no conflict of interest existed. The 400 Group neglected this essential fiduciary duty/obligation owed to the shareholders.
This was particularly true in Bryan's case because of his triple role as CEO of Guaranty, a director of the Board, and president and agent for The 400 Group. Bryan testified that in a letter to The 400 Group, the words, "we purchased" in one paragraph referred to The 400 Group, "we settled" in another paragraph referred to Guaranty, while "we made $13,000" in yet another paragraph also referred to Guaranty. Bryan testified the words "we own," in his employee meeting *900 agenda notes, referred to The 400 Group, but "we made $13,000" referred to Guaranty.
Determining whether the law of agency applies is difficult because Bryan acted in three different capacities. Originally, the trial judge believed The 400 Group acted as agent for Bancshares when Bryan purchased the note. He changed his mind after listening to all the evidence. We certainly agree The 400 Group was not acting as Bancshares' agent. It was acting in its own capacity with Bryan as its agent when it bought the note. The agreement signed by the original members of The 400 Group on December 23, 1987, is clear about its first primary objective: purchasing the Capital Bank note for $400,000.00.[30]
A number of former directors, shareholders, and non-shareholders who were members of The 400 Group testified about whether they knew The 400 Group was a separate entity, whether they knew of and understood The 400 Group's purpose, and whether they expected anything in return for their investment.
Simon Weil, a director and member of The 400 Group, testified:
We purchased that note with the intent of trying to put it in friendly hands so that this Bank could recoup its momentum and be approved for the F.D.I.C. Forbearance Program. We had nono feeling that we owned anything in particular at that time.
* * * * * *
We felt like Guaranty[,] we put it in the hands of Guaranty and Guaranty would in time reimburse us for it with stock when Guaranty would get back on its feet.
Weil testified there was "no doubt in my mind" The 400 Group bought the note for Guaranty. Weil also said that when the offer was made (on or about October 22, 1987) to buy the note for $400,000.00, there already was a firm commitment by the Board to extend this amount to purchase the note.
Eugene Holloway, a charter shareholder in Guaranty and member of The 400 Group, testified his primary reason for joining The 400 Group was "[t]o save Guaranty and protect my little stock ... and not only that, I thought it would be embarrassing to have Guaranty fail, you know, for the community." Apparently, Holloway then believed Guaranty or Bancshares was going to buy the note.
Victor A. Debataz, a former director of Guaranty and Bancshares, was a shareholder who contributed to The 400 Group after its formation in December 1987. He testified he contributed to save Guaranty, and "that was my only thought." Debataz said he would have loaned money to Guaranty or to Bancshares to save Guaranty, and he never even considered getting anything back for his money.
Mark Frey, the son of former director and shareholder Fred Frey, did not own stock in Guaranty. At their father's request, however, Mark and his brother Mitchell each contributed money to The 400 Group. Mark Frey testified his father asked him to loan money because Guaranty needed money and, if his father had asked, Mark would have loaned money directly to Guaranty or Bancshares.
Fred Frey issued a check for $100,000.00 and Martin Frey issued a check for $50,000.00 in December 1987. Both checks were payable to "GB & T/400 Group."
Myron James Prevost testified he contributed money to save his stock. He stated, "I don't know who took the money, to tell you the truth." Prevost said he did not think he would get any stock for his money, he expected only to get his actual contribution back. Prevost further testified,
I live a hundred miles from here. I can't know what's going on in this bank more than what reports they make to me, you know.... undoubtedly it wasn't too good at thatsometime back.
Lynn J. Schexnayder, a non-shareholder who contributed money and became a member of The 400 Group, testified he did not think he was a member of The 400 Group. He said in 1988 someone called him and *901 asked if he would help because Guaranty was having financial problems.
I sent them a check for six thousand dollars ($6,000.00). I did not know anything about the 400 Group. I was never informed that I was a member of the 400 Group. I never signed anything to that extent.
Q. Did you think that you were just giving your money to Guaranty for its use?
A. Well, yes I did. I didn't ask for anything, you know, how it was going to be paid back. I just left that up to the people in Guaranty. I didn't ask for no stock. I didn't ask for any amount of interest to be paid on this money or anything. They were in trouble and I thought I'd help them.
Bryan was questioned regarding negotiation of the terms of the notes and of the terms of The 400 Group. Bryan viewed The 400 Group's purchase of the note as a "contractual agreement between the company and these people that raised the money to... put up the money and eventually get stock in return." Bryan, when asked who negotiated this "contractual agreement" on behalf of Bancshares, stated, "If you wanted to say who is the person who put all the parties and pieces together, you would have to say it was me."
Witnesses also were questioned about other alternatives besides injecting money through The 400 Group. Several of the shareholders who contributed to The 400 Group testified they would have contributed solely to help save Guaranty. Bryan testified he did not ask the FDIC, through Houston, if new money could be injected into Guaranty and then used to purchase the note. Houston testified equivocally on this point, but opined this alternative probably would have been acceptable. Houston testified he was not concerned with how Guaranty raised the capital, only that it was raised and current levels were not depleted.
Bryan testified he never talked to any original member of The 400 Group about making loans directly to Bancshares or Guaranty "because I wouldn't have done that." Bryan did not believe "once it's explained correctly and adequately to a Shareholder that any Shareholder would have agreed to... give the others who didn't contribute, the benefit [of a $900,000 gift]."
Clearly, it was in the best interest of Guaranty and the shareholders to pursue any alternative which might have eradicated the debt. As chief executive officer of Guaranty and as a director of Bancshares, it was Bryan's duty to seek the best way to accomplish this goal. Instead, by his own admission, he did not approach the problem in this manner. For example, he would not have given non-contributing shareholders the same benefits as those who contributed. Though Bryan performed extraordinary measures, and devoted considerable time and talent in completing the proposal that saved Guaranty, his duty to Guaranty and the shareholders remained. His efforts saved Guaranty, but the duty was owed to both Guaranty and the shareholders, and could not be split. Unfortunately, the shareholders did not fare so well.
Other actions also showed how blurred the lines became between The 400 Group's identity and Guaranty's identity. Weil confirmed The 400 Group meetings were held in Guaranty board room, usually within 15-20 minutes of Board meetings, to allow the rest of The 400 Group members to arrive. Bryan testified members of The 400 Group were provided with copies of Guaranty's quarterly reports to the FDIC "after the 400 Group became the creditor." He further admitted notices of The 400 Group meetings were prepared at Guaranty on Guaranty's computers using Guaranty's postage. Records of contributions were kept on Guaranty's computer. Copies of Guaranty's quarterly reports to the FDIC were shared with The 400 Group by mail and by use of an overhead screen projector at meetings.
Weil confirmed no directors recused themselves from any of the decisions regarding The 400 Group until December 1992. He also confirmed there was never a discussion in 1988 concerning possible conflicts of interest, and no Board member ever suggested a non-interested person attend the Board meetings to represent the interests of the shareholders.
*902 When the proxy materials were prepared for the June 1988 meeting at which the exchange was to be ratified, the Board decided to include the sentence contained on page 14 of the 1988 proxy materials, which indicated The 400 Group might seize and sell Guaranty's stock pledged to it if the shareholders did not ratify.
Weil confirmed that all correspondence to shareholders after December 1987 offered only the opportunity to join The 400 Group and no one was offered an opportunity to contribute directly to Bancshares or Guaranty.
At trial, Bryan said the Board tried to tell the shareholders what was happening at every opportunity, "but it's been difficult getting the ... shareholders to listen." The problem, he said, "was that the shareholders weren't reading the communications."
The December 1986 shareholder meeting proxy materials suggested shareholders, who were interested in helping to raise money through one of the suggested alternatives, could respond by checking a box and returning the letter to Bryan. Bryan testified he received only seven responses. At the July 1987 special shareholder meeting, called to discuss the potential capital-for-equity exchange with Capital Bank, Bryan said only 15-20 shareholders attended, 10 of whom were Board members. Bryan admitted the letter, mailed to the shareholders on November 4, 1987, did not say Capital Bank had agreed to sell the note for $400,000.00, nor did it say Guaranty had been accepted into the forbearance program. These particular issues were discussed at the shareholder meeting, but few people attended.
Clearly the attitude shown by the shareholders contributed to the problems faced by Bryan and the Board. Nevertheless, the lack of enthusiasm from the shareholders regarding recapitalizing the failing Guaranty did not relieve the Board of its continuing duty to those same Guaranty shareholders. Larry Roberts, the chief financial officer during Bryan's tenure as CEO, confirmed the Board felt a duty to invest in Guaranty as an example to the shareholders, but most of the directors were nevertheless reluctant to do so because of Guaranty's condition. Roberts and Bryan both confirmed many shareholders were not sophisticated financial investors.
Weil said the Board assumed in 1988 that $1 million was owed to The 400 Group, not $2.5 million. But Bancshares' and Guaranty's consolidated financial statements always showed the full unpaid balance as a liability, with accruing interest, in accord with the note's terms. However, when asked by a Bancshares attorney why in 1992 the Board believed it owed The 400 Group in excess of $3 million, Weil explained:
A lot of hard work, a lot of planning, a lot of risk, other things that it took to get this Bank [Guaranty] back on its feet. Collecting debts, getting people to turn over their collateral for unpaid debts. It was just a lot of unpleasant work that had to be done.
After thoroughly reviewing all the documentary evidence and trial testimony in this case, we find two conclusions are inescapable: 1) The 400 Group's purchase of the Capital Bank note and its injection of money saved Guaranty from insolvency, and 2) the Board lost sight of its fiduciary duty to the shareholders. The trial court, focusing on the fact that the money injection ultimately kept. Guaranty from failing, either believed this factor justified the breach of duty to the shareholders or did not believe there was a breach of duty at all. The reasons dictated by the trial judge indicate the latter. In either case, we find it was legal error, thus, we must modify his judgment on the breach of duty issue.
We cannot approve of The 400 Group's self-described "contractual agreement" with Bancshares because no one represented Bancshares' interest. A select few created an agreement which they subjectively felt was fair payment for the risk of injecting new capital, and for the effort expended in saving the failing Guaranty. Their price was ownership of Guaranty. This "agreement" was then thrust on the shareholders with the threat of foreclosure if they did not agree. The shareholders never received an armslength bargain, nor did they receive an adequate, disinterested explanation of their options and the potential consequences. The *903 400 Group could not enforce the notes and foreclose as easily as the proxy statement suggested. This is evidenced by this very complex litigation that arose due to The 400 Group's attempts to enforce the notes.
The trial court in this case failed to fully apply the law. The law not only requires directors to meet the standard of fairness to the corporation as required in Revised Statute 12:84, but it further imposes a fiduciary duty as stated in Revised Statute 6:291. This duty runs not only to Guaranty, but to the shareholders as well. An interested director transaction can meet the standard of 12:84(C) and still fail to meet the standards of 6:291. The trial court legally erred in failing to determine whether The 400 Group carried its heavy burden of proving the directors' actions were arms-length transactions which were inherently fair to the shareholders as well as the corporation. The record shows the Board failed to carry this burden.

D. PRESCRIPTION
Plaintiffs argue all three notes have prescribed, contending the "creditor" did not maintain continuous possession of the pledged object, i.e., the stock certificates. We disagree. Bryan, who was the appointed agent and president of The 400 Group, always maintained possession of the notes and the stock certificates. Although he kept them in the Guaranty vault until he was relieved of his duties, we do not find this interrupted his possession or that Guaranty was possessing precariously on behalf of The 400 Group. Therefore, we find the notes had were not prescribed.

E. THE 90/10 EXCHANGE
The 400 Group contends the doctrine of "election of remedies" does not preclude it from seeking to enforce the exchange. We have found the exchange should not be enforced for other reasons; therefore, discussion of this issue is pretermitted. We decline, as the trial court did, to enforce any exchange of stock. Insofar as the trial court refused to enforce an exchange of stock, the judgment is affirmed.

F. CONCLUSION
It is not so much The 400 Group's course of action to save Guaranty that is objectionable. Rather, we find the arrangement made for its members unilaterally, one which would have divested the shareholders of 90% of their stock and one which was made without complete disclosure to the shareholders (as found by us and the trial court), breached the fiduciary duty required in Revised Statute 6:291.
The 400 Group members who invested money in recapitalizing Guaranty are entitled to recover their investment at reasonable interest. We find, as the trial court did, Bancshares is responsible for repayment of the $414,223.28 note and the $186,000.00 note. We also find the interest, as stated in the allonges to those notes and the pledge of Guaranty stock as security on those notes, was fair and equitable when executed. Therefore, insofar as the trial court recognized Bancshares' responsibility to repay these notes, the judgment of the trial court is affirmed.
The 400 Group members who extended the $400,000.00 to purchase the Capital Bank note shall be reimbursed the amounts they paid for purchase of the note at the interest rate provided for in the allonges. This result satisfies the statutory requirements of Revised Statute 6:291, and 12:84 and 12:91 generally. The pledge of 100% of Guaranty's stock to secure this note is also recognized. Accordingly, the trial court's judgment on the Capital Bank note is amended and reduced to $400,000.00 in principal plus stated interest.
The trial court, in its discretion, awarded The 400 Group $155,000.00 in attorney fees. Bancshares and Guaranty seek to have these fees reduced, while The 400 Group seeks to have them increased. We find the award was not an abuse of discretion. Furthermore, because neither party in this appeal can be considered the "prevailing party," we decline to award additional attorney fees.
Costs of this appeal are assessed equally between the parties.
*904 AFFIRMED IN PART, AMENDED IN PART, AND RENDERED.
PARRO, J., concurs with the result and assigns reasons.
PARRO, Judge, concurring.
Although I can agree with the result reached by the majority, I do not agree with this court substituting its own determination for that of the trial court on a fact-based conclusion. The question of whether or not a breach of duty has occurred is always dependent on the particular facts of the case, as those facts are revealed to the trial court. The majority has essentially ignored this aspect of the fact-finding process in concluding the Board breached its fiduciary duty to the shareholders under the unique factual situation presented in this case. There is a reasonable factual basis in the record for the trial court's finding that the Board members did not breach their fiduciary duty to Guaranty, Bancshares, or the shareholders when they joined with other persons and risked their personal funds to save the bank from certain extinction. Furthermore, the trial court's factual findings are not manifestly erroneous or clearly wrong, based on the entire record.
Having superimposed its own determination on this issue, the majority then fashions a remedy without providing any basis from Louisiana statutes or jurisprudence. The majority affirms the trial court's validation of the purchase of the Capital Bank note by The 400 Group, but reduces the recovery on that note. Whereas the trial court recognized The 400 Group's entitlement to the full balance due on the note, the majority allows reimbursement only for the amount paid for purchase of the note at the stated interest rate. Although the majority asserts this result "satisfies the statutory requirements of Revised Statute 6:291, and 12:84 and 12:91 generally," none of these statutes provides for a result such as this.
It is precisely because the facts of this case are so unusual that there is no legislation or jurisprudence which directly addresses these particular circumstances. However, there is a very basic tenet of Louisiana law which allows this court to fashion a solution such as that reached by the majority, but without finding that the Board breached its fiduciary duty. Louisiana law provides for novel situations like this in Civil Code article 4, which states simply:
When no rule for a particular situation can be derived from legislation or custom, the court is bound to proceed according to equity. To decide equitably, resort is made to justice, reason, and prevailing usages.
It is entirely equitable for the members of The 400 Group to recover their investment plus reasonable interest, as noted by the majority with reference to the funds invested in recapitalizing Guaranty. Their initial investment in the purchase of the Capital Bank note should be similarly treated to obtain an equitable result. This is simply more equitable than allowing The 400 Group to recover the entire balance due on the note, including principal and interest, when its members did not put that amount at risk and particularly when the record indicates this was never their intention when the note was purchased. This result also finds support in a case from the Louisiana Fourth Circuit Court of Appeal, which, although not directly on point, provides some guidance in fashioning an equitable solution. See Dunbar v. Williams, 554 So.2d 56 (La.App. 4th Cir.1988). In that case, a director of a corporation was the owner of another company which entered into a sale of equipment to the corporation. Although the director's interest was fully disclosed and the court found the transaction was fair to the purchasing corporation, the court also found the profit earned by the interested director's company should be returned to the purchaser corporation because the shareholders had not formally approved the purchase.
Accordingly, although I cannot agree with the majority's finding that the Board breached its fiduciary duty, I concur with the result.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] In September 1991, Guaranty's name was changed to "Team Bank." It was changed back to Guaranty Bank & Trust in 1993.
[3] Although technically two separate boards, the members of the Board of Directors for Bancshares and Guaranty are always the same individuals. Hereinafter, "the Board" is used to refer to the one group of individuals who sat on both boards.
[4] No payments had been made on any of the notes.
[5] Bancshares was substituted as plaintiff against The 400 Group after the August shareholder meeting.
[6] Louisiana Revised Statute 6:291, as it read before its 1992 amendment, was an almost verbatim restatement of Revised Statute 12:91:

Officers and directors shall be deemed to stand in a fiduciary relation to the state bank and its stockholders and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinarily prudent men would exercise under similar circumstances in like positions....
The officers and directors of a state bank have the same fiduciary relationship to stockholders as officers and directors of a corporation have to shareholders. The comments under this section state: "This section is derived from R.S. 12:91."
[7] The terms "full face value" or "full face amount" refer to the unpaid balance on the note, to distinguish this from the discounted cost.
[8] The unpaid principal was $1,369,000.00, and accrued interest to February 18, 1986, was $38,838.35.
[9] A letter dated April 21, 1986, to Bryan from Thomas R. Mecredy, vice president of Sheshunoff Investment Banking Services, reflects a valuation of Bancshares' stock. The company's appraisal found the fair market value of common stock was "negligible." Bryan testified Sheshunoff is a Texas bank consulting firm whose opinion he sought to establish the value of the corporation for dealing with prospective investors.
[10] The FDIC had broadened the criteria to allow more banks to qualify.
[11] Capital would have had legal problems caused by banking regulations if it had kept 25% or more of the stock.
[12] Its acceptance previously depended upon the proposed debt-for-equity exchange with Capital and the injection of $1 million in capital into Guaranty.
[13] The record does not contain minutes from the November 18, 1987, shareholder meeting.
[14] Those present included Board members Lester J. Bergeron, Sr., Bryan, Dr. Anthony J. Grezaffi, Edwin J. Leonards, Nolen C. Miller, Marion S. Monk, Jr., John M. Olinde, Sr., and Simon D. Weil, along with the Board's attorney, James Dewey. Shareholders present were Esper Marionneaux, Eugene Holloway, Joe Dreyfus, and Sidney Dreyfus. The two "key outsiders" invited because the Board thought they might be willing and able to invest substantial funds, were Jeff Smith and Fred Frey. Although not present, Martin Todd Frey was represented by Fred Frey and Charles Courtney was represented by Bryan.
[15] Dewey's notes indicate The 400 Group originally considered exchanging the note for 51% of Guaranty's stock, and at other times discussed exchanging for 90%.
[16] Charles Courtney, a non-shareholder expert in banking and advisor to Guaranty, subsequently pledged $50,000.00, bringing the total to $595,000.00.
[17] The initial signers were: Bryan, Nolen C. Miller, Simon D. Weil, Marion S. Monk, Jr., John M. Olinde, Sr., Lester Bergeron, Sr., Dr. A.J. Grezaffi, and Edwin J. Leonards (Board members), as well as Charles E. Courtney, Jr., George W. Gremillion. Frederick J. Frey, Martin Todd Frey, A.J. Dreyfus, R. Keith Miller, Eugene Holloway, and Jeff Smith.
[18] The approximate percentages of contributions were as follows: Bryan, 8.3%; N. Miller, 8.3%; F. Frey, 16.7%; M. Frey, 8.3%; Dreyfus, 8.3%; Gremillion 0.83%; K. Miller, 0.83%; Holloway, 3.3%; Weil, 4.2%; Monk, 3.3%; Olinde, 1.7%; Bergeron, 4.2%; Smith, 4.2%; Grezaffi, 2.5%; Leonards, 16.7%; and Courtney, 8.3%.
[19] Raymond Long, a founding director of Guaranty who was no longer on the Board, sued Guaranty for $1.5 million. Bryan consistently represented the lawsuit as frivolous, but it nevertheless caused serious problems with raising money. Guaranty potentially could have been lost to Long if he recovered in the lawsuit, which discouraged investors from recapitalizing the foundering bank. When Long was deposed in March 1994, this action was still pending.
[20] The interest rate originally contained in the note was 10% per year. An allonge dated October 29, 1992, stated that due to an "oversight and clerical error" this interest rate was incorrect. The allonge changed the interest rate to "a rate equal to the prime commercial lending rate charged by the Chase Manhattan Bank of New York, New York, as said rate may vary from time to time." The interest rate on the allonge was the same as the rate on the note purchased from Capital and was lower than the originally-stated rate of 10% per year. The allonge was accepted by Bryan in his capacity as president of The 400 Group.
[21] The breakdown shows no new investors joined The 400 Group and only five of the original investors extended more money: Bryan, Fred Frey, Jeff Smith, Edwin Leonards, and Charles Courtney.
[22] This Sheshunoff "fairness" analysis was an opinion letter dated June 13, 1988, and was based on data provided by the Board. It does not go into any detail other than to say the exchange, based on available information, is "fair" to the shareholders and to Bancshares. The letter specifically states:

We have not independently verified any of the information reviewed by us and have relied on its being complete and accurate in all material respects. In addition, we have not made an independent evaluation of the assets of the Company and Bank.
[23] This note also contained a provision for 10% interest, which an allonge dated October 29, 1992, changed to "a rate equal to the prime commercial lending rate charged by the Chase Manhattan Bank of New York, New York, as said rate may vary from time to time."

The allonge was "agreed and accepted" by Bryan in his capacity as President of The 400 Group.
[24] Bank reports to the FDIC show by the end of 1990 Guaranty had increased its equity capital to 3.8%; by December 1991, it was increased to 5.08%, which exceeded projections.

Daniel Domingue, Bryan's successor as CEO, testified at trial regarding Guaranty's net profits between 1987 and 1993. The net profits in 1987 were $34,000.00; in 1988, negative ($350,000) (due to write downs in other real estate and a loss on sale of securities); 1989, $389,000.00; 1990, $88,000; 1991, $504,000; 1992, $533,000.00; and 1993, $779,000.00.
[25] The Federal Reserve Bank was responsible for oversight of Bancshares. Bancshares was examined July 24, 1991.
[26] J.B. Olinde and H.T. Olinde, Jr., were founding directors who resigned from the Board in May 1985. They did not participate in the purchase of the note and recapitalization by The 400 Group.
[27] The motion was seconded by H.T. Olinde, Jr.
[28] Carolyn Tumbull, a certified public accountant with Postlethwaite and Netterville, Guaranty's and Bancshares' external auditors, attended this meeting. Bryan stated at the meeting the CPA firm's advice was to "do something now because of income tax and other considerations," but the minutes from the meeting do not indicate Tumbull responded to any questions on this issue. However, at trial she testified Guaranty had significant net operating losses to offset any tax effect from forgiveness of indebtedness income which might have occurred. Tumbull testified that at the time the note was purchased Guaranty had $6.8 million in accumulated net operating losses, of which $4.4 million eventually expired unused. She confirmed Bancshares would not have been required to pay any taxes if it had purchased the note for $400,000.00.
[29] Lester Bergeron Sr., Bryan, Fred Frey, Grezaffi, Arnold F. Hess, Jr., Edwin Leonards, R. Keith Miller, John M. Olinde, Sr., Simon D. Weil, and Jeff Smith were removed.
[30] Its second objective was to impose certain obligations on Guaranty, including raising $600,000.00 of additional capital during 1988.