723 So.2d 1127 (1998)
Gary W. THORNTON, on Behalf of LANECO CONSTRUCTION SYSTEMS, INC., and Gary W. Thornton, Individually
v.
John W. LANEHART and James Bradley Lanehart.
No. 97 CA 2871.
Court of Appeal of Louisiana, First Circuit.
December 28, 1998.
*1129 Lee Herrington, Baton Rouge, for Plaintiff-Appellant Gary W. Thornton, Individually and on behalf of Laneco Construction Systems, Inc.
R. Loren Kleinpeter, Kleinpeter & Kleinpeter, G. Steven Duplechain, Baton Rouge, for Defendants-Appellees John W. Lanehart and James Bradley Lanehart.
Before: LeBLANC, FOGG, and PARRO, JJ.
PARRO, J.
This is one of three appeals stemming from a single lawsuit filed by Gary W. Thornton, a minority shareholder in Laneco Construction Systems, Inc. (Laneco), a closely-held corporation. The lawsuit asserted direct and derivative claims against the majority shareholders, John W. Lanehart (John) and James Bradley Lanehart (Brad), who are officers and directors of Laneco, for actions they took after Thornton resigned as an officer and director of the company. This appeal is from a trial court judgment that granted the defendants' motion for involuntary dismissal and dismissed Thornton's derivative claims on behalf of the corporation, as well as his direct claims against the Laneharts, individually. We affirm.

BACKGROUND
In March 1996, after almost nine years as a one-third owner, president, and director of Laneco, Thornton resigned as president and formed a competing commercial drywall company, Thornco, Inc. (Thornco). About one month later, he also quit working for Laneco and resigned his position on its board of directors. John and Brad Lanehart, each of whom also owned one-third of Laneco, remained in place as a two-person board of directors and as officers in the corporation. They took over many of Thornton's responsibilities and promoted several other key employees to assist with day-to-day operations of the business. Brad was elected president of Laneco and John continued as secretary and financial officer.
In a series of board meetings, at which the Laneharts were the only remaining directors, they approved certain actions challenged by Thornton, including: (1) increasing their monthly salaries to almost double their previous amounts; (2) issuing and selling five shares of previously authorized, but unissued, shares of stock to Laneco's attorney, R. Loren Kleinpeter, for $20 per share; (3) declaring employee bonuses at the end of the fiscal year that included $165,000 for Brad and $150,000 for John; and (4) authorizing payment of a dividend of only $5 per share on all outstanding shares. These actions were the subject of Thornton's derivative claims; Laneco and Kleinpeter were named as nominal defendants, along with the Laneharts.
Some of these claims were the subject of a March 1997 hearing on Thornton's rule to show cause why a writ of mandamus should not issue, directing the Laneharts to return their salary increases and bonuses to the corporation and recall the stock sold to Kleinpeter. The trial court denied mandamus relief in a judgment signed April 4, 1997. This judgment was affirmed this date by this court in appeal docket number 97 CA 1995. In that appeal, this court also upheld the trial court's decision not to appoint a receiver for the corporation.[1] An additional issue concerned Thornton's right to inspect Laneco's corporate records. After hearing testimony during the March hearing and also at the *1130 trial in July 1997, the trial court granted a writ of mandamus, but ordered production of only some of the records requested by Thornton, with limitations to protect the confidentiality of particular Laneco records. Thornton appealed that decision, and it was also affirmed this date in appeal docket number 97 CA 2870.
These two judgments do not address Thornton's claim that the corporation should be forced to declare an additional dividend for the July 31, 1996 accounting year. Thornton also asserted direct claims for monetary damages against the Laneharts, individually, for intentional interference with certain contractual agreements he had with Laneco. The intentional interference with contract claims were based on the Laneharts' decisions: (1) to declare the forfeiture of Thornton's participation in the employee deferred compensation plan; (2) to withhold from Thornton's dividend check two months of insurance premiums for continuing his health insurance benefits under COBRA; and (3) to pay Thornton's wages only through the day he left Laneco, April 17, 1996, rather than continuing those wages through the end of the month.
The trial of Thornton's direct and derivative claims was held July 10 and 11, 1997. At the close of the plaintiff's case, the defendants moved for involuntary dismissal of all Thornton's claims; the trial court granted the motion and dismissed the claims. That judgment, signed September 10, 1997, is the subject of this appeal.
Thornton claims the trial court erred in dismissing, pursuant to LSA-C.C.P. art. 1672, the derivative claims, including his requests: (1) for distribution of additional dividends to all shareholders for the July 31, 1996 accounting year; (2) for return of the Laneharts' salaries, directors' fees, and bonuses to the compensation level existing before May 31, 1996, and/or for a money judgment against them for the excess amounts, and/or for a set-off of the excess amounts against any additional shareholder dividends which may be distributed to them; (3) for damages payable to the corporation for the Laneharts' issuance and sale of five shares of stock to Kleinpeter for inadequate consideration; and (4) for attorney fees, expert fees, and court costs in connection with the shareholder's derivative action. Thornton also assigns as error the trial court's dismissal of his personal claims against the Laneharts for intentional interference with his contracts with Laneco.

APPLICABLE LAW

Involuntary Dismissal
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence. LSA-C.C.P. art. 1672(B). In determining whether involuntary dismissal should be granted, the appropriate standard is whether the plaintiff has presented sufficient evidence on his case-in-chief to establish his claim by a preponderance of the evidence. Tyler v. Our Lady of the Lake Hospital, Inc., 96-1750 (La.App. 1st Cir.6/20/97), 696 So.2d 681, 684. The court is free to evaluate the evidence and render a decision based upon a preponderance of the evidence, without any special inferences in favor of the party opposed to the motion. Phillips v. Phillips, 95-2043 (La.App. 1st Cir.5/10/96), 673 So.2d 333, 334. Proof by a preponderance of the evidence simply means that, taking the evidence as a whole, the evidence shows the fact or cause sought to be proved is more probable than not. McCurdy v. Ault, 94-1449 (La.App. 1st Cir.4/7/95), 654 So.2d 716, 720, writ denied, 95-1712 (La.10/13/95), 661 So.2d 498.
The effect and weight to be given expert testimony is within the broad discretion of the trial judge. The importance placed upon such testimony is largely dependent upon the expert's qualifications and the facts that form the basis of his opinion. McCartney v. Columbia Heights Nursing *1131 Home, Inc., 25,710 (La.App. 2nd Cir.3/30/94), 634 So.2d 927, 933. While it may not be lightly disregarded, even uncontradicted expert testimony is not binding on the court. Sanders v. Wysocki, 92-1190 (La.App. 4th Cir.1/27/94), 631 So.2d 1330, 1334, writ denied, 94-0506 (La.4/22/94), 637 So.2d 156.
Appellate review for sufficiency of the evidence begins with a review of the facts using the manifest error standard. See Ambrose v. New Orleans Police Dept. Ambulance Serv., 93-3099 (La.7/5/94), 639 So.2d 216, 221, n. 6. The trial court's decision to grant a motion for involuntary dismissal should not be reversed in the absence of manifest error. Robinson v. Dunn, 96-0341 (La.App. 1st Cir.11/8/96), 683 So.2d 894, 896, writ denied, 96-2965 (La.1/31/97), 687 So.2d 410.

Shareholder Derivative Action
Subject to the provisions of the articles of incorporation, the bylaws, or Louisiana business corporation law, all corporate powers shall be vested in, and the business and affairs of the corporation shall be managed by, the board of directors of the corporation. LSA-R.S. 12:81(A). A director occupies a fiduciary relation to the corporation and its stockholders, and is required to perform his duties in good faith and with that diligence, care, judgment, and skill which ordinarily prudent men would exercise under similar circumstances in a like position. LSA-R.S. 12:91. The fiduciary cannot take advantage of his position for his personal benefit to the detriment of the corporation or its shareholders. Olinde v. 400 Group, 95-1233 (La.App. 1st Cir.12/6/96), 686 So.2d 883, 885, writ denied, 97-0633 (La.5/9/97), 693 So.2d 767. The fiduciary is responsible for proving that his actions were in good faith and that he was guided by inherent fairness to the corporation. Hirsch v. Cahn Elec. Co., Inc., 29,327 La.App. 2nd Cir.5/9/97), 694 So.2d 636, 642, writ denied, 97-1561 (La.10/3/97), 701 So.2d 200.
When a corporation refuses to enforce a right of the corporation, a shareholder may bring a derivative action to enforce the right on behalf of the corporation. LSA-C.C.P. art. 611. In a derivative action, the shareholder bringing the suit is only a nominal plaintiff, and the real party plaintiff is the corporation, because the shareholder claims to be suing on behalf of the corporation. Robinson v. Snell's Limbs and Braces of New Orleans, Inc., 538 So.2d 1045, 1048 (La.App. 4th Cir.1989). It is well-established that a shareholder of a corporation does not generally have a right to sue personally for alleged losses sustained by the corporation due to mismanagement and/or a breach of fiduciary duties. See Palowsky v. Premier Bancorp, Inc., 597 So.2d 543, 545 (La.App. 1st Cir.1992), and cases cited therein. Rather, a shareholder may only sue to recover losses to a corporation resulting from mismanagement and breaches of fiduciary duties secondarily through a shareholder's derivative suit. Theriot v. Bourg, 96-0466 (La.App. 1st Cir.2/14/97), 691 So.2d 213, 217, n. 2, writ denied, 97-1151 (La.6/30/97), 696 So.2d 1008. However, there may be instances in which the breach of fiduciary duty causes a direct loss to the shareholder, but not to the corporation, in which case the shareholder may have a right to sue individually. See Wilson v. H.J. Wilson Co., Inc., 430 So.2d 1227 (La.App. 1st Cir.), writ denied, 437 So.2d 1166 (1983).

Intentional Interference With Contract
An officer of a corporation owes an obligation to a third person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult, or impossible, or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct. The officer's action is justified, and he is entitled to a privilege of immunity, if he acted within the scope of his corporate authority and in the reasonable belief that his action was for the benefit of the corporation. Thus, an officer is privileged to induce the corporation to violate a contractual relation, or make its performance more burdensome, provided that the officer does not exceed the scope of his authority or knowingly commit acts that are adverse to the interests of the corporation. Where officers knowingly and intentionally *1132 act against the best interest of the corporation or outside the scope of their authority, they can be held liable by the party whose contract right has been damaged. 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 231 (La.1989). The elements of an action against a corporate officer for intentional interference with contractual relations are as follows: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty in its performance brought about by the officer. 9 to 5 Fashions, Inc., 538 So.2d at 234.

ANALYSIS

Intentional Interference With Contract
We turn first to Thornton's claims against the Laneharts, individually, alleging some of their decisions constituted tortious interference with his contractual relationship with Laneco. After a thorough review of the evidence, we conclude the trial court did not err in dismissing these claims, because Thornton did not establish them by a preponderance of the evidence.
The Laneharts, acting as the board of directors, declared the forfeiture of Thornton's interests in the deferred compensation plan. Certain plan provisions allowed the board to determine whether a covered employee's actions were inimical to the best interests of Laneco and, if so, to declare a forfeiture of benefits. There is evidence in the record from Thornton's own testimony, as well as other witnesses, that while still employed by Laneco, Thornton used Laneco's computer to prepare a business plan for his new company, attempted to hire two key Laneco people to work for Thornco, and asked one of Laneco's project foremen to order additional scaffolding for a Laneco job and deliver it to his residence for his new company. The Laneharts listed these and other actions as reasons for the forfeiture of Thornton's interest in the deferred compensation plan. This decision was justified and was within the board's discretionary authority under the plan. Accordingly, the trial court correctly dismissed Thornton's claim on this issue.
On April 17, 1996, Thornton resigned his position on the board, left the Laneco offices, and did no further work for Laneco. Before that day, the parties anticipated Thornton would stay through the end of the month and, of course, would be paid for that time. Although Thornton's testimony conflicted with that of other witnesses, there is support for the trial court's implicit conclusion that any promise to pay him wages until the end of the month was premised on the assumption that he would still be working during that time. Absent a definite agreement to pay him even while he was not working, the Laneharts' decision not to pay him through the end of the month could not be an interference with his contractual rights and was justified.
After Thornton left, there was a series of ambiguous communications concerning continuation of his family's health insurance benefits under COBRA and payment of premiums for that coverage. At one point, Thornton's attorney sent Laneco a letter demanding that Thornton receive his COBRA health insurance benefits.[2] Although Thornton did not pay the premiums for that coverage, he also did not specifically advise Laneco until July 1996 that he had obtained other health insurance coverage and did not want his COBRA benefits. Laneco paid for this coverage and the Laneharts deducted the cost of the premiums from Thornton's stock dividend. We conclude the court correctly determined Thornton did not prove by a preponderance of the evidence that this decision was intentional interference with his contractual rights with Laneco.

*1133 Shareholder Derivative Action

A shareholder derivative action is brought by a shareholder against those responsible for making decisions for the corporation. The claim is not for the direct benefit of the shareholder, but is brought on behalf of the corporation; any recovery is returned to the corporation, not to the individual asserting the claim. The crux of a shareholder derivative action is proof that mismanagement and breaches of fiduciary duties caused loss and damage to the corporation. In this lawsuit, Thornton claims the Laneharts breached their fiduciary duties to Laneco by paying themselves excessive salaries, bonuses, and directors' fees; he seeks the return of the excess compensation to the corporation. He also asserts the sale of five shares of stock to Kleinpeter was for inadequate consideration, and requests damages on behalf of the corporation for the true value of those shares. To that point, the claims made in the lawsuit are purely derivative.
However, Thornton's true complaint in this lawsuit is not that the Laneharts' actions have damaged the corporation. On the contrary, he stipulated that Laneco is well-managed by the Laneharts and it is abundantly clear from the record that Laneco is an extremely profitable company under the Laneharts' supervision. Even after paying the compensation Thornton characterizes as excessive, Laneco's net profit before taxes for the fiscal year ending July 31, 1996, was $792,645. An internal, unaudited financial statement for the fiscal period through February 28, 1997, showed Laneco's net profit to that point was $329,375 and cash on hand was $770,056. Both CPAs who testified for Thornton agreed the corporation, as managed by the Laneharts, is a highly successful and profitable endeavor.
When Thornton bought into Laneco, he paid $1000 for 333 shares of stock; he later received an additional 100 shares as a stock dividend. John and Brad Lanehart's capital contributions were the same; each paid approximately $3 per share for his initial interest and later received an additional 100 shares. By comparison, the five shares of stock sold to Kleinpeter were priced at $20 per share, an amount Thornton now deems inadequate.
Likewise, the compensation levels being challenged by Thornton are not radically different from what they were when he was there. The increased salaries for the Laneharts represent a combined amount equal to the salary Thornton had been drawing as Laneco's president before he resigned. The bonuses were also typical for a profitable year; Thornton himself received bonuses ranging from $20,000 in 1993 to $257,900 in July 1989. His total income while employed by Laneco exceeded the total income of either of the Laneharts for that same period, even counting the July 1996 bonuses they received. And the increase in the directors' fees was nominalfrom $12,000 per year to $13,000 per year for John and from $18,000 per year to $19,500 per year for Brad. Until he resigned his position, Thornton was also receiving $12,000 per year in directors' fees. Thornton himself acknowledged that he thought all of these compensation levels were quite fair while he was employed there, and only became unfair when he left, stating, "[I]t was fair [when] I had salary, bonuses, director's fees, and dividends.... [W]hen I left the last year, it ceased to be equal."
This statement reveals the true nature of this case. Although couched as a derivative suit, Thornton really is asking the court to mandate a higher distribution of Laneco's profits to him by requiring the Laneharts to return some of their compensation to the corporation and then requiring the corporation to use those funds to increase its dividend payments. His claim is that the Laneharts breached their fiduciary duties to him, a minority shareholder, and should be required to pay him (and the other shareholders) higher dividends.
In support of this claim he presented testimony from two CPAs, John Gautreau and Debra White Lockwood.[3] Both of these witnesses compared Laneco to other industrial *1134 contractors with relatively similar sales volume, using information from a statistical compilation published by Robert Morris & Associates (RMA). This company compiles data submitted to it by banks from financial statements provided to those banks by companies seeking commercial loans. Both CPA's concluded from their analyses of these comparisons that Laneco was paying its officers and directors too much and distributing too little to shareholders as dividends. However, on cross-examination11 of Ms. Lockwood, she admitted that the calculations were built on a foundation that is not statistically reliable because the RMA information is not compiled by random sample, may include companies with varied product lines in each classification, and used a relatively small number of companiesonly one hundred sixin the particular classification in which Laneco fit. She acknowledged Laneco is not at all typical by virtue of being much more profitable than the companies in the RMA statistics. She also admitted that, when analyzing the cash needs of Laneco, she did not consider the company's use of cash to fund its own projects, and in fact suggested Laneco "should be drawing on a line of credit which is what most people are doing in order to fund those types of jobs," in order to bring it more in line with the other companies in the RMA reports.
The trial court stated in reasons for judgment:
Even before cross examination of Ms. White by Mr. Kleinpeter I had some concerns over the Robert Morris figures. Obviously those figures were derived from banks who voluntarily report to Robert Morris concerning their customers. So, it naturally excludes all companies who do business on a cash basis, as obviously Laneco is in a position to do.... So I question those figures and I question the evidence given by Ms. White. And she reluctantly admitted finally under cross examination if the Robert Morris figures are brought into question, her entire analysis is brought into question. So, I'm going to ... rule that there has been no evidence presented to convince me that the plaintiff will prevail on that issue. And I will grant the motion for involuntary dismissal with regard to the payment of dividends.
The trial court must evaluate the testimony of experts on the basis of their qualifications and the reliability of the factual data used in formulating their opinions. Based on our review of the record, we determine the trial court's conclusions concerning the experts' testimony on this issue were within his discretion.
However, Thornton argues the trial court was manifestly erroneous in this judgment because the court prefaced its analysis by stating it was not aware of any cause of action to force a corporation to pay dividends. As definitive authority for such action, Thornton cites the Hirsch case, in which the trial court did order a redistribution of dividends after finding the officers and directors breached their duty of good faith owed to the corporation and the minority shareholder by paying themselves excessive compensation and bonuses over a six-year period. We do not find that case persuasive in this instance. The trial court there "succinctly outline[d] the disparity between the operating losses and the overall compensation that the Cahns were paid," and also noted that bonuses and salaries of the directors were never expressly approved by the board of directors. Hirsch, 694 So.2d at 642. These factors are not present in Laneco's situation. Far from operating at a loss, Laneco is highly profitable, even after payment of all salaries, bonuses, and directors' fees. Moreover, all compensation decisions were duly made by the board of directors.
Furthermore, in determining it had the authority to order the corporation to declare a dividend, the Hirsch court relied on the following language from the syllabus of a 1910 Louisiana Supreme Court case:
The court will not interfere in the affairs of a corporation at the instance of a stockholder and cause a distribution of a surplus, unless it is manifestly evident that interference is necessary in the interest of the corporation and its stockholders, and it must appear that there is capricious, arbitrary, or discriminating management. *1135 Marks v. American Brewing Co., 126 La. 666, 52 So. 983 (1910).
Hirsch, 694 So.2d at 643. Interestingly, however, the Marks case involved a shareholder who, while not denying the success of the business, only wished the board of directors to add to the amount paid to her in dividends by dividing the company's surplus. The court denied this request and flatly refused to order any additional dividend, stating simply, "A large surplus does not justify interference." Marks, 52 So. at 984. Accordingly, we are not convinced that the Hirsch rationale is applicable to Thornton's claim for dividends.
The trial court also considered the evidence presented concerning the appropriate price for the shares of stock sold to Kleinpeter. The court noted Ms. Lockwood indicated she never made an analysis of what discount would be applied for a minority interest, and there was insufficient evidence to show the amount paid by Kleinpeter for such an extreme minority position was so low as to constitute an abuse of fiduciary duty. We find no error in this determination.

CONCLUSION
Based on our review of the entire record, we cannot say the trial court was manifestly erroneous in finding Thornton's evidence did not establish his right to relief on either his individual or derivative claims by a preponderance of the evidence. Accordingly, no relief in the form of attorney fees, expert fees, or court costs for the derivative claims was warranted, and the trial court's ruling concerning this is also correct. The trial court's judgment is affirmed and all costs are assessed to Thornton.
AFFIRMED.
NOTES
[1] Although the claims for mandamus relief and appointment of a receiver were dismissed by the trial court, the underlying derivative claims remained in the lawsuit and the evidence from the March 1997 hearing was considered along with additional evidence at the trial of the remaining issues in July 1997.
[2] This letter was from the attorney representing Thornton at that time; he later retained his present counsel.
[3] Mr. Gautreau's testimony was actually presented in connection with the mandamus and receivership claims, but in connection with those issues, he did testify concerning excessive compensation and adequacy of dividends using the Robert Morris guidelines.